**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2013 AUG 12  P 4: 19

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DAVID M. KWIATKOWSKI** | ) |

**No. 1:12-cr-149-JL**
**No. 1:13-cr-72-JL**

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United

States of America by its attorneys, John P. Kacavas, the United States Attorney for the District of

New Hampshire, Barry R. Grissom, the United States Attorney for the District of Kansas, Rod J.

Rosenstein, United States Attorney for the District of Maryland, Michael J. Moore, United States

Attorney for the Middle District of Georgia, and the defendant, David Kwiatkowski, and the

defendant's attorneys, Bjorn Lange, Esquire, and Jonathan Saxe, Esquire, enter into the

following Plea Agreement:

1.  The Plea and The Offense.

The defendant agrees to plead guilty to all 14 counts of the Indictment, which charge him

with seven counts of tampering with a consumer product, in violation of 18 U.S.C. § 1365(a),

and seven counts of obtaining controlled substances by fraud, in violation of 21 U.S.C.

§ 843(a)(3).

With respect to actions occurring in the District of Kansas, the defendant also agrees to

waive his right to have this matter presented to a grand jury and plead guilty to an Information

charging him with one count of tampering with a consumer product, in violation of 18 U.S.C.

§ 1365(a) and one count of obtaining controlled substances by fraud, in violation of 21 U.S.C.

§ 843(a)(3).   The defendant agrees to plead guilty to these charges in the District of New

Hampshire pursuant to Fed. R. Crim. P. 20.

In exchange for the defendant's guilty plea, the United States agrees to the sentencing

stipulations identified in section 6 of this agreement.

2. The Statute and Elements of the Offense.

**Tampering with a Consumer Product**

Title 18, United States Code, Section 1365(a) provides, in pertinent part:

Whoever, with reckless disregard for the risk that another person will be
placed in danger of death or bodily injury and under circumstances manifesting
extreme indifference to such risk, tampers with any consumer product that affects
interstate or foreign commerce, or the labeling of, or container for, any such
product or attempts to do so shall . ... be imprisoned not more than ten years.

18 U.S.C. § 1365(a) (West 2012).

The defendant understands that the offense has the following elements, each of which the

United States would be required to prove beyond a reasonable doubt at trial:

First, that the defendant acted with reckless disregard for the risk that another person will

be placed in danger of death or bodily injury;

Second, that the defendant acted under circumstances manifesting extreme indifference to

the risk of death or bodily injury;

Third, that the defendant tampered with a consumer product or the labeling or container

of the product; and

Fourth, that the consumer product affected interstate or foreign commerce.

18 U.S.C. § 1365(a).

–2–

**Obtaining Controlled Substances by Fraud**

Title 21, United States Code, Section 843(a)(3) provides, in pertinent part:

It shall be unlawful for any person knowingly or intentionally . . . to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge.

21 U.S.C. § 843(a)(3) (West 2012).

The defendant understands that the offense has the following elements, each of which the

United States would be required to prove beyond a reasonable doubt at trial:

First, that the defendant acted knowingly and intentionally;

Second, the defendant acquired or obtained possession of a controlled substance; and

Third, that the acquisition or obtaining of the controlled substance was affected by

misrepresentation, fraud, forgery, deception or subterfuge.

21 U.S.C. § 843(a)(3).

3. Offense Conduct.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove the following facts and those facts would establish the elements of the offense beyond a reasonable doubt:

The defendant was trained as a health care worker. The defendant completed a training program in radiologic technology at William Beaumont Hospital in Michigan in 2003. After completing this program, he became a registered member of the American Registry of Radiologic Technicians. As a health care worker, he had both training and experience that informed him about the methods by which blood-borne viral diseases such as Hepatitis C can be transmitted.

−3−

On an unknown date, the defendant became infected with Hepatitis C.   Hepatitis C is a blood-borne viral disease that primarily is transmitted by exposure to infected blood.   This disease can cause a variety of symptoms and can cause damage to the liver, as well as other health issues.   In some instances, the disease can be deadly.

The defendant worked at multiple health care facilities in Michigan between 2003 and 2007.   The defendant was terminated from a position with St. Joseph Mercy Health System in 2004 after testing positive for controlled substances.   The defendant was terminated by William Beaumont Hospital in 2004 for "gross misconduct."   The defendant resigned from a position at the University of Michigan Hospital in 2006 while an investigation related to missing controlled substances (including fentanyl) was under way.   The defendant resigned from a position at Oakwood Annapolis Hospital after he was suspended pending an investigation of his potential controlled substance use.

Beginning in November of 2007, the defendant began working as a "traveler."   Working through various placement agencies, the defendant would take short-term positions at different medical facilities.   Between 2007 and 2011, the defendant worked in New York, Pennsylvania, Maryland, Arizona, Kansas, Georgia, and New Hampshire.

In May of 2008, the defendant was terminated from a placement at the University of Pittsburgh Medical Center.   On or about May 7, 2008, an employee witnessed the defendant remove a syringe of fentanyl from an operating room.   Subsequent testing showed that the defendant had replaced that syringe with another syringe that did not contain fentanyl.   A search of the defendant's person revealed three empty syringes bearing "fentanyl" labels.   While a basic drug screen of the defendant did not reveal any controlled substances, a more sophisticated analysis later detected the presence of fentanyl in the defendant's system.

−4−

Less than two weeks later, the defendant began a placement at the VA Medical Center in Baltimore, Maryland. The defendant worked there between May and November of 2008. While the defendant was working at the facility, a patient received fentanyl during a procedure on or about May 27, 2008. The patient had no known risk factors for Hepatitis C. The patient subsequently has been found to have a strain of Hepatitis C that has been genetically linked to the strain of Hepatitis C with which the defendant is infected.

Between July of 2009, and January of 2010, the defendant worked at Johns Hopkins University Hospital in Baltimore, Maryland. At least six patients who were treated at Johns Hopkins during the time frame that the defendant worked at the hospital have been found to have a strain of Hepatitis C that has been genetically linked to the strain with which the defendant is infected.

Between March of 2010, and April of 2010, the defendant worked at the Arizona Heart Hospital in Phoenix, Arizona. According to witnesses and records from Arizona, on or about April 1, 2012, the defendant was found unresponsive in a restroom. A needle and syringe labeled "fentanyl" were observed by witnesses to be floating in the toilet. After regaining consciousness, the defendant flushed the toilet and expressed concerns about going to jail. He later admitted to injecting himself with fentanyl, but denied a history of drug use. Subsequent drug testing showed that the defendant had marijuana and cocaine in his system. Although no opiates were detected in the defendant's system, the drug screen did not specifically test for fentanyl.

In May of 2010, the defendant worked at Hays Medical Center in Hays, Kansas. While the defendant was working in Kansas, he was told by a physician that he had Hepatitis C. At least six patients who were treated at Hays during the time that the defendant worked there have

been found to be infected with a strain of Hepatitis C that has been genetically linked to the strain with which the defendant is infected.

One of these individuals, KS Patient #1, underwent cardiac catheterization procedures on or about June 7, 2010, and July 12, 2010. Records show that the defendant participated in both procedures. KS Patient #1 has died and a coroner has concluded that Hepatitis C played a contributing role in the patient's death.

In April of 2011, the defendant took a temporary position at Exeter Hospital in Exeter, New Hampshire. He subsequently was hired as a full-time employee in the fall of 2011. The defendant's coworkers noticed that the defendant sometimes exhibited unusual behavior, including sweating, having bloodshot eyes, leaving procedures before they were completed, and telling false stories.

Witnesses from Exeter Hospital would testify that the defendant worked in the Cardiac Catheterization Lab ("CCL"), where certain invasive procedures were performed. As a technician, the defendant was not authorized to handle controlled substances. Ordinarily, controlled substances were maintained in a secure machine (known as a Pyxis) until shortly before procedures began. One of the substances frequently administered during procedures at the CCL was fentanyl, a Schedule II controlled substance. Exeter Hospital employees would testify that fentanyl would be contained in vials. After the vials were removed from the Pyxis, a nurse would draw the fentanyl into a syringe. A blue label saying "fentanyl" would then be placed on the syringe. It would then be placed on top of the Pyxis until the drug was needed. The fentanyl would then be administered to the patient through an intravenous line.

Records from Exeter Hospital and other business records demonstrate that all of the fentanyl that was purchased and used during the time that the defendant was employed at Exeter

-6-

Hospital was manufactured outside of New Hampshire and traveled in interstate commerce.

In May of 2012, representatives of Exeter Hospital identified several unexplained cases of Hepatitis C involving individuals who had been treated at the CCL. The defendant also was diagnosed with Hepatitis C and falsely advised caregivers and others that he was unaware that he had this disease when he in fact had been aware of this diagnosis since 2010. A public health investigation was initiated that later determined that the source of the outbreak of Hepatitis C was drug diversion by the defendant. The medical literature contains several examples of situations where health care workers transmitted Hepatitis C by stealing fentanyl, injecting the drug into their body, refilling the syringe with saline, and then allowing the contents of the saline-filled syringe (which was tainted with the Hepatitis C virus) to be injected into the patient.

The defendant was interviewed on multiple occasions by law enforcement. During two interviews with law enforcement, he stated that he only recently had been informed by a doctor that he had tested positive for Hepatitis C. He described this news as a "time bomb" and falsely stated that he had not previously known that he was infected with Hepatitis C. He stated that he "had no idea" that he had the disease "until a couple weeks ago." The defendant stated that he was aware that the disease was transmitted by blood to blood contact.

On June 29, 2012, a federal search warrant was executed on Kwiatkowski's motor vehicle in Massachusetts. Among the items recovered was an empty syringe bearing a blue "fentanyl" label that was consistent with the type of labels used at Exeter Hospital. Several needles were also recovered, one of which was found to contain the defendant's DNA.

On July 19, 2012, the defendant was arrested pursuant to a criminal complaint. After being advised of his *Miranda* rights, Kwiatkowski agreed to speak with investigators. Nearly all of this interview was video recorded. In his statement, the defendant admitted that he had

-7-

been diagnosed with Hepatitis C in 2010 while working in Kansas.  He also admitted that while working at Exeter Hospital, he would "swap out" fentanyl by taking a syringe of fentanyl and replacing it with a syringe of saline.  He would use the fentanyl by injecting it into his arm. Afterward, he would refill the used syringe with saline and then perform another swap.

Asked during the interview if anyone helped him divert drugs at Exeter Hospital, the defendant replied, "It was all me."  An agent followed up, "It was all you?"  The defendant responded, "Yeah . . . And I'm going to kill a lot of people out of this."  The agent asked, "I'm sorry?"  The defendant said, "I'm killing a lot of people."

The defendant estimated that he swapped out syringes on approximately 50 separate occasions while working at Exeter Hospital.  He also stated that fentanyl was the only drug he used at Exeter Hospital.

The defendant admitted that he diverted drugs in a similar way at Houston Medical Center in Georgia and Hays Medical Center in Kansas.  He estimated that he swapped syringes at least 20 times in Kansas and approximately 30 times in Georgia.

The defendant admitted that he had been diverting controlled substances, including fentanyl, since approximately 2002.  He admitted that he got caught stealing fentanyl at the University of Pittsburgh.  He also admitted to swapping syringes at Johns Hopkins University Hospital in Maryland, but claimed that no patients would have gotten infected there.

As a result of the defendant's actions, public health departments and the Centers for Disease Control and Prevention ("CDC") conducted a massive public health investigation. Public health authorities recommended that over 11,000 people get tested for possible Hepatitis C infection as a result of the defendant's conduct.

The CDC has conducted genetic testing known as quasispecies analysis that can

-8-

determine the genetic relatedness between different samples of the Hepatitis C virus. That testing has determined that at least 32 patients who were treated at Exeter Hospital, six patients from Johns Hopkins, one patient from the VA Medical Center in Baltimore, and six patients from Hays Medical Center all share the same strain of Hepatitis C as the defendant. Based upon the defendant's admissions and the scientific and epidemiological evidence, the defendant's drug diversion conduct resulted in each of these infections. Several of the victims who were infected with Hepatitis C have experienced very serious health complications.

With respect to each of the counts set forth in the indictment, the United States would present evidence that each of the patients underwent procedures at the CCL at Exeter Hospital and had no prior history of Hepatitis C. After being treated at the CCL on a day when the defendant was present, each of these individuals was found to have the same strain of Hepatitis C as the defendant.

### Counts One and Two

Patient #1 is a Marine veteran who is over 50 years old. On January 12, 2012, Patient #1 was treated at the CCL after being brought to the emergency department at Exeter Hospital because of a heart attack. Patient #1 would testify that he was transported to the CCL by the defendant and that he saw the defendant in the CCL. Patient #1's spouse would testify that she saw the defendant leave the CCL and go into a restroom while Patient #1 was in the procedure room. Records from Exeter Hospital show that fentanyl was first withdrawn from the Pyxis at approximately 10:52 a.m., but not administered until approximately 11:01 a.m. Card key access records show that the defendant used a card key to enter the CCL at approximately 11:00 a.m. Patient #1 received approximately 400 micrograms of fentanyl, including two doses within the first five minutes of the procedure. Patient #1 recalls getting doses of fentanyl and

–9–

not feeling much difference in his body after receiving the drug.

Patient #1 later was found to have a strain of Hepatitis C that has been genetically matched to the defendant's strain of Hepatitis C. Patient #1 has experienced pain as a result of his Hepatitis C. He would testify that it has made him difficult to control his diabetes or to sleep through the night. He has lost weight and is unable to travel for work, which he had done in the past.

### Counts Three and Four

Patient #2 is over 70 years old. He underwent a procedure at the CCL on January 27, 2012. Records from Exeter Hospital show that the fentanyl for his procedure was withdrawn from the Pyxis approximately 16 minutes prior to being administered. Although the defendant was not assigned to work on Patient #2's procedure, card key records show that he entered the CCL before and after the procedure and Patient #2 recalls interacting with the defendant.

Patient #2 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain. As a result, Patient #2 experienced substantial health problems. The liver problems resulting from Patient #2's Hepatitis caused a delay in a surgery that he was going to undergo. Since then, Patient #2 has had to undergo major surgery and his health has deteriorated. Moreover, an individual associated with Patient #2 also has become infected with a strain of Hepatitis C which has been linked to the defendant.

### Counts Five and Six

Patient #3 is a Navy veteran who is over 80 years old. He underwent a procedure at the CCL on January 31, 2012. The fentanyl was withdrawn from the Pyxis approximately eight minutes before it was administered. Although the defendant was not assigned to Patient #3's procedure, he was working that day and records show that he entered the CCL before and after

-10-

the procedure.

Patient #3 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain.   As a result, Patient #3 experienced substantial health problems, including substantial fatigue.   Patient #3 would testify that the disease has placed a physical and emotional strain on his family.   Patient #3's spouse would testify that Patient #3 is so fearful of transmitting the disease to others that he refuses to kiss her on the lips.

### Counts Seven and Eight

Patient #4 is retired and is over 60 years old.   Patient #4 underwent a procedure in the CCL on February 13, 2012.   Exeter Hospital records show that the fentanyl for her procedure was withdrawn from the Pyxis approximately 16 minutes before it was administered.   Although the defendant was not assigned to her procedure, cardkey access records show that he entered the CCL at least twice during Patient #4's procedure, including less than ten minutes after the first administration of fentanyl.

Patient #4 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain.   As a result, Patient #4 would testify that she has experienced fatigue and stress.   Patient #4 also has had to seek mental health counseling to help her to deal with the uncertainty created by her diagnosis.

### Counts Nine and Ten

Patient #5 is an Army veteran who is over 40 years old.   Patient #5 underwent a procedure at the CCL on February 17, 2012.   Exeter Hospital records show that the fentanyl for his procedure was withdrawn from the Pyxis approximately seven minutes before it was administered.   Although the defendant was not assigned to Patient #5's procedure, cardkey access records show that he entered the CCL at least once during the procedure.

Patient #5 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain.   As a result, Patient #5 would testify that he experienced substantial health problems, including fatigue, body aches, lack of appetite, and weight loss.   In addition to his physical problems, Patient #5 also would testify that he has experienced emotional pain as a result of his diagnosis, including difficulty socializing and fear of infecting others.

**Counts Eleven and Twelve**

Patient #6 is over 60 years old.   Patient #6 was admitted to Exeter Hospital and underwent a procedure at the CCL on Saturday, February 25, 2012.   Employees from Exeter Hospital would testify that although the CCL is not ordinarily open on Saturdays, it is sometimes opened on an as-needed basis.   Although the defendant was not "on call" that day and not required to be present, he was present at the CCL for Patient #6's procedure as well as another procedure that occurred that day.   The defendant initially assisted with setting up for an earlier procedure because some staff members had not yet arrived.   Once the staff members arrived, he remained at the CCL despite being told that he could go home.   Exeter Hospital records show that the fentanyl for Patient #6's procedure was withdrawn from the Pyxis approximately 18 minutes before it was administered to Patient #6.

Patient #6 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain.   In fact, the other patient who was treated at the CCL that day also was found to be infected with the defendant's strain of Hepatitis C.   As a result, Patient #6 would testify that she experienced health problems, including fatigue.   Patient #6 also would testify that she is fearful of exposing her grandchild to the virus.

**Counts Thirteen and Fourteen**

Patient #7 is over 50 years old and underwent a procedure at the CCL on March 12, 2012.

–12–

Exeter Hospital records show that the defendant was assigned to work on Patient #7's procedure. Records also show that the fentanyl for this procedure was withdrawn from the Pyxis approximately eight minutes before it was administered. Patient #7 recalls interacting with the defendant and observing the defendant sweating substantially.

Shortly after the procedure, Patient #7's health deteriorated and he had to be transferred to another hospital for treatment. Patient #7 was later found to have a strain of Hepatitis C that was genetically linked to the defendant's strain. Patient #7 would testify that he has experienced substantial health problems as a result of the disease and the treatment for the disease. In fact, Patient #7 was unable to return to work after developing Hepatitis C.

4. <u>Penalties, Special Assessment and Restitution.</u>

The defendant understands that the penalties for the offense are:

**Tampering with a Consumer Product (18 U.S.C. § 1365(a))**

A. A maximum prison term of ten (10) years;

B. A maximum fine of $250,000 (18 U.S.C. § 3571); and

C. A term of supervised release of not more than three (3) years. The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. § 3583).

**Obtaining Controlled Substances by Fraud (21 U.S.C. § 843(a)(3))**

A. A maximum prison term of four (4) years;

B. A maximum fine of $250,000 (18 U.S.C. § 3571); and

C. A term of supervised release of not more than one (1) year. The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release,

requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. § 3583).

The defendant also understands that he will be required to pay a special assessment of $1,600, $100 for each count of conviction, at or before the time of sentencing; and that the Court may order him to pay restitution to the victims of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5.   <u>Sentencing and Application of the Sentencing Guidelines.</u>

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court may consider the sentencing range established by the United States Sentencing Guidelines in determining whether to accept this plea agreement.   The defendant further understands that he has no right to withdraw his guilty plea if the applicable sentencing range established by the Sentencing Guidelines is other than he anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

A.   Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B.   Respond to questions from the Court;

C.   Correct any inaccuracies in the pre-sentence report;

D.   Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentencing range under the

Sentencing Guidelines is only a prediction and not a promise as to the actual sentencing range under the Sentencing Guidelines that the Court will adopt.

      6. Sentencing Stipulations and Agreements.

      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agree that a sentence of no greater than 40 years of imprisonment and no less than 30 years of imprisonment is the appropriate disposition of this case.

      The parties intend the above stipulation to be "binding" under Fed. R. Crim. P. 11(c)(1)(C).   By using the word "binding," the parties mean that if the Court will not accept the plea agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw his guilty pleas.

      The parties are free to make recommendations with respect to fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

      7.   Acceptance of Responsibility.

      The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense.   The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

      A.     Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

      B.     Challenges the United States' offer of proof at any time after the plea is entered;

C.    Denies involvement in the offense;

D.    Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.    Fails to give complete and accurate information about his financial status to the Probation Office;

F.    Obstructs or attempts to obstruct justice, prior to sentencing;

G.    Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.    Fails to appear in court as required;

I.    After signing this Plea Agreement, engages in additional criminal conduct; or

J.    Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive credit for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8.   Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every

stage of the proceeding and, if necessary, one will be appointed to represent him.   The

defendant also understands that he has the right:

    A.    To plead not guilty or to maintain that plea if it has already been made;

    B.    To be tried by a jury and, at that trial, to the assistance of counsel;

    C.    To confront and cross-examine witnesses;

    D.    Not to be compelled to provide testimony that may incriminate him; and

    E.    To compulsory process for the attendance of witnesses to testify in his
           defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the

foregoing rights and that upon the Court's acceptance of the his guilty plea, he will not be

entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions

about the offense, and if he answers those questions falsely under oath, on the record, and in the

presence of counsel, his answers will be used against him in a prosecution for perjury or making

false statements.

9.   Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

    A.    Is entering into this Plea Agreement and is pleading guilty freely and
           voluntarily because he is guilty;

    B.    Is entering into this Plea Agreement without reliance upon any promise of
           benefit of any kind except as set forth in this Plea Agreement;

    C.    Is entering into this Plea Agreement without threats,
           force, intimidation, or coercion;

–17–

D.   Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

E.   Is completely satisfied with the representation and advice received from his undersigned attorney.

10.   Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the his guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11.   Collateral Consequences.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12.   Satisfaction of Federal Criminal Liability; Breach.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire, the District of Kansas, the District of Maryland, and the Middle District of Georgia, arising from his participation in the conduct that forms the basis of the indictment, information, and relevant conduct in this case. The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any

−18−

criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13. Waivers.

A. Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if that sentence is within the stipulated sentencing range specified in section 6 of this agreement.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel in the negotiation of this Plea Agreement or at the sentencing hearing.

B. Collateral Review

The defendants understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motions or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if that sentence is the stipulated

–19–

sentence or within the stipulated sentencing range specified in section 6 of this agreement.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel in the negotiation of the Plea, Plea Agreement or the sentencing hearing.   The defendant's waiver of his right collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the cases underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal authorized by law.

14.   <u>No Other Promises</u>.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court. The defendant has, however, received assurances from the New Hampshire Attorney General's

Office and the County Attorney in Ellis County, Kansas that no state criminal charges will be filed against him if he complies with the terms of this Plea Agreement.

     15.    <u>Final Binding Agreement</u>.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney, as well as an Assistant United States Attorney from the District of Kansas, the District of Maryland, and the Middle District of Georgia.

     16.    <u>Agreement Provisions Not Severable</u>.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN P. KACAVAS
United States Attorney
District of New Hampshire

Date: _8/9/13_

By: _____
John J. Farley
Assistant U.S. Attorney
N.H. Bar # 16934
53 Pleasant St., 4th Floor
Concord, NH 03301
John.Farley@usdoj.gov

Date: 7-23-13

BARRY R. GRISSOM
United States Attorney
District of Kansas


By: _Tanya G. Treadway_
Tanya Treadway
Assistant U.S. Attorney


Date: 7/30/13

ROD J. ROSENSTEIN
United States Attorney
District of Maryland

By: _____
Sandra Wilkinson
Assistant U.S. Attorney


Date: 7/26/13

MICHAEL J. MOORE
United States Attorney
Middle District of Georgia

By: _____
Michael T. Solis
Assistant U.S. Attorney

The defendant, David M. Kwiatkowski, certifies that he has read this 23-page Plea Agreement and that he fully understands and accepts its terms.

Date: 7/18/13

David M. Kwiatkowski, Defendant

We have read and explained this 23-page Plea Agreement to the defendant, and he has advised us that he understands and accepts its terms.

Date: 7-18-13

Bjorn Lange, Esquire
Attorney for David M. Kwiatkowski

Date: 7/18/13

Jonathan Saxe, Esquire
Attorney for David M. Kwiatkowski

–23–